# In the United States Court of Federal Claims

<span style="color:red">CORRECTED COPY</span>

No. 19-1308C
(Filed Under Seal:  November 22, 2019)
(Reissued for Publication:  December 6, 2019)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| HVF WEST, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| LAMB DEPOLLUTION, INC., | * |
| | * |
| Defendant-Intervenor. | * |

Postaward Bid Protest; RCFC 52.1;
Cross-Motions for Judgment on the
Administrative Record; Waiver;
Solicitation Ambiguity; Motion to Dismiss;
RCFC 12(b)(1); Subject-Matter Jurisdiction;
Permanent Injunction

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

E. Sanderson Hoe, Washington, DC, for plaintiff.

Margaret Joy Jantzen, United States Department of Justice, Washington, DC, for defendant.

Shar Bahmani, Scottsdale, AZ, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this postaward bid protest, plaintiff HVF West, LLC ("HVF") alleges that the Defense Logistics Agency Disposition Services ("DLA") erred by not selecting HVF as an awardee in connection with a solicitation for the purchase and destruction of government property.

---

     *  The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions.  The parties submitted their proposed redactions on which they all agree and also noted three statements that only defendant-intervenor contends should be redacted.  With respect to the statements on which the parties disagree, the court finds that plaintiff's and defendant's position is correct:  the statements are not subject to redaction because they do not contain sensitive information.  The court otherwise agrees with the parties' proposed redactions, and those redactions are indicated with bracketed ellipses ("[. . .]").

Specifically, HVF asserts that the sales contracting officer ("SCO") committed prejudicial error when he failed to consider all of the evaluation criteria for Lamb Depollution, Inc. ("Lamb")—the awardee—and follow the evaluation process in the solicitation with respect to the other bidders.  Defendant and Lamb, who intervened to defend its interest as the awardee, dispute HVF's contentions.  The court is presented with defendant's and Lamb's motions to dismiss, their respective motions to strike a declaration, and the parties' cross-motions for judgment on the administrative record.  For the reasons explained below, the court grants HVF's motion for judgment on the administrative record and denies defendant's and Lamb's motions.

## I.  BACKGROUND

### A.  Solicitation

On February 27, 2019, the DLA issued solicitation A0007598—an invitation for bids for a contract to purchase and destroy United States military property.[1]  Administrative R. ("AR"). 174.  Specifically, the DLA explained that the "[t]ypical categories of items that require destruction may include, but are not limited to, vehicles, vehicular components, tanks, tank components, aircraft, aircraft parts, armored vehicles, armored protective equipment, practice bombs, all training/simulation devices, [and] camo nets . . . ."  Id. at 175.  Bidders were asked to submit their bids to purchase the property as "a percentage of the Scrap Sales Price Point of $1.9625," id., with a higher bid being more advantageous to the government because bidders were stating how much they would pay the government for each pound of property, see id. at 172 (identifying the Scrap Sales Price Point as a per-pound measurement).  The awardee would receive a three-year contract that included an option for two one-year extensions.[2]  Id. at 176.

### 1.  Required Performance

Pursuant to the contract, the awardee was required to start performance "within 30 days of contract award."  Id. at 183.  The awardee's performance consisted of (1) removing property from the DLA's Tucson Centralized Demilitarized Division or Receipt in Place locations on or around Davis-Monthan Air Force Base, (2) transporting the property to an off-site facility within fifty miles of that base, and (3) demilitarizing or mutilating the property at that facility.  Id. at 174-75, 181.  The awardee needed to be able to remove and demilitarize or mutilate 100,000 pounds of property per day.  Id. at 182.  A contractor demilitarized property by "eliminating the functional capabilities and inherently military design features" and mutilated the same by "render[ing the] material unfit for its originally intended purposes."  Id. at 178; see also id. at 181

---

[1]  The DLA stated in the solicitation that "the annual estimated weight to be offered under this contract is 19,000,000 pounds per year" and that "weight quantities may vary from a minimum of 9,500,000 pounds to a maximum of 28,500,000 pounds per year . . . ."  AR 176.

[2]  The parties disagree on whether, under the solicitation, the SCO could select more than one awardee.  Without expressing an opinion on whether there could be one awardee or multiple awardees, the court uses "awardee" for the sake of simplicity and clarity.

(requiring the awardee to ensure that demilitarization and mutilation "is accomplished in a manner that prevents recognition and reconstruction"). Of particular import here, an awardee needed to "completely shred[]" data plates and military markings. Id. at 184. After the DLA and the awardee verified that the demilitarization or mutilation was complete, the awardee received title to the resulting scrap materials. Id. at 181; see also id. at 178 (defining "scrap" as "materials that have been rendered useless beyond repair, rehabilitation, or restoration such that the items['] original identity, utility, form, fit, and function have been destroyed"). At each step of its performance, the awardee was required to comply with all applicable laws concerning human safety and the environment. Id. at 176.

## 2. Bid Submission

Bidders were required to submit their bid by the "bid opening" date, id. at 186, which was apparently March 6, the "auction closing date,"[3] id. at 174, 186. With respect to bid content and submission method, the DLA explained:

> Bids may be submitted on the [DLA] website, on the bid form provided in this invitation or submitted in a manner that contains the same requested information, prepared in ink, indelible pencil, or typewritten, and signed by the person submitting the bid. Bids may be submitted via:
>
> > a. U.S. Mail
> > b. Express Mail/Hand Carried Bids
> > c. Telegraphic Methods (Telegram/Mailgrams/Facsimiles)[.] Bids submitted by telegraphic means must be specific and include the following information:
> >
> > > Name and title of sender[]
> > > Complete business name (if a business)
> > > Complete address and telephone number
> > > Invitation for Bid Number
> > > Percentage of Market Bid

Id. at 186. The DLA also stated that "[a]ll bids should be addressed and mailed or delivered to:

> Attention Bid A00___
> DLA Disposition Services
> 74 N. Washington Ave.
> Battle Creek, MI 49037
> Facsimile Number: (269) 961-7568

Id. at 187.

---

[3] The DLA either opened the bids on March 6, 2019, or on March 7, 2019, because the SCO informed HVF that it was not the apparent highest bidder on March 7, 2019, at 1:34 PM. AR 60.

### 3. Evaluation Process

In a section of the solicitation titled "Bidders," the DLA explained that "[a]ward(s) for this item will be based on the highest priced, responsive, responsible bidder and other factors, whose bid is the most advantageous to the [United States] Government . . . ." Id. In the next sentence, the DLA stated that being the highest bidder "does not convey any special right nor does it imply that the purchaser will be the primary removal company or exclusively allowed to remove throughout the term of this contract." Id.

Although the DLA provided the aforementioned standard, it did not explicitly address that the process the SCO would use to determine the awardee. See id. at 187-89. The DLA did not state in the solicitation whether the SCO would review nonprice information for every bidder or focus exclusively on the highest bidder (and consider the next highest bidder only if the highest bidder was not satisfactory). See id. The process, to the extent one can be identified, appears to flow from the aforementioned "Bidders" section and the subsequent sections titled "Pre-Award Requirements" and "Criteria used for Award." See id.

The preaward-requirements section, despite its title, is not limited to preaward conditions. See, e.g., id. at 187 (discussing a postaward conference). In that section, the DLA addressed requirements that the "purchaser" must comply with before the award, shortly after the award, and while performing the contract. See id. Specifically, the section includes the following provisions:

- "Statement of Intent and End Use Certificate applies and will be completed and submitted for this [contract]. A pre-award survey will be conducted to determine the bidder's capability to perform in accordance with the terms and conditions of the sales contract."

- "[The DLA] will conduct a post-award conference within two (2) weeks after award . . . to ensure Purchaser fully understands the terms and conditions of this contract."

- "Purchaser facility will pass a post-award inspection by [the DLA] personnel prior to contract award."

- "Purchaser will complete [an End-Use Certificate] and [Statement of Intent] during the pre-award phase. . . . Delay in completion may result in Purchaser being considered non-responsive and disqualified from successful award."

- "Purchaser will be required to obtain a Trade Security Assessment/Clearance by providing the [SCO] a properly completed [End-Use Certificate] . . . upon notification of potential winning bid."

- "Purchaser acknowledges that some items in the product pool may be subject to export restrictions . . . ."

- Purchaser is required to comply with [United States] Department of State and [United States] Department of Commerce export laws and regulations when reselling property obtained from [United States Department of Defense]. To this end, Purchaser will have sufficient process to screen resale purchasers and provide notice to all re-sale purchasers of their obligations to follow all export law and regulations."

- "Provide documentation of Responsible Recycling standards . . . or e-Steward and . . . maintain R2/e-Steward certification throughout the life of the contract."

The section that immediately follows the "Pre-Award Requirement" section is titled "Criteria used for Award." Id. at 188. In that section, the DLA specified nine elements that the SCO would consider when awarding a contract:  preaward survey; treatment, storage, and disposal facility ("TSDF") plan; safety procedures; processing facility; financial responsibility; training; procedures demonstrating capability; experience; and schedule (collectively, "technical information"). Id. at 188-89. Of particular import to the instant protest are the following elements:

1. PRE-AWARD SURVEY[.]  Prior to the award of a contract, [the DLA] will determine whether the potential Purchaser has the necessary permits/licenses, experience, organization, and technical qualifications (either through its own facilities or facilities of a subcontractor) to perform the work specified in this contract and is capable of complying with applicable Federal, state, and local laws, ordnances and regulations.

2. [TSDF] PLAN.  The TSDF identified in the plan must address the following[:] . . . [the i]dentification and description of at least one temporary storage facility meeting [the] requirements of 40 CFR [§] 761.65 . . . ; [t]he procedures for identification, removal, treatment and temporary storage of PCB items . . . ; and [t]he Environmental Protection Agency [("EPA")] . . . identification number of the facility where demilitarization, mutilation and remediation is to be accomplished.

3. SAFETY PROCEDURES.  The following safety procedures should be addressed. Safety procedures shall cover all phases of the contract work . . . . Safety equipment to be used while on the Government premises and during transportation of any hazardous wastes created must be specified in response to this section.

. . . .

5. FINANCIAL RESPONSIBILITY.  Provide a cost projection with regard to each contract operation, i.e., transporting, storage, [demilitarized or m]utilation, sales, and hazardous material and waste disposal.  The cost projections must be itemized.  Also, provide evidence that the capital is available to cover projected costs.  This may be in the form of a letter of intent from a financial institution or an itemized certified financial statement.

    6.  TRAINING.  Documentation on the bidder's training program sufficient to demonstrate compliance with Resource Conservation and Recovery Act [("RCRA")], Toxic Substances Control Act [("TSCA"),] Department of Transportation [("DOT")], and [Occupational Health and Safety Administration's ("OSHA")] training requirements relative to hazardous property training.

. . . .

    8.  EXPERIENCE.  The name, address, phone number, contract number, (if applicable) and a brief description of the services, of either commercial concerns or Government agencies, for which prior comparable services have been rendered by the bidder.

Id.  For those criteria (and the others in the section), the bidder needed to submit the information in a manner that "conform[s] to the requirements set forth in th[e] solicitation."  Id. at 189.  A bidder would be deemed nonresponsible if it failed to provide satisfactory information for any of the elements noted in the criteria-used-for-award section.  Id.  A successful bidder, therefore, was required to submit more than just how much it would pay for the scrap materials, but the DLA did not identify in the solicitation when the bidder would provide that information or who—all bidders, some bidders, or just the highest bidder—must do so.  See id. at 188-89; see also id. at 186-87 (indicating that the substantive information in a bid consists of the price the bidder is willing to pay for the scrap materials).

## B.  Bids and Evaluation

    Four bidders submitted timely bids.  See id. at 36.  Lamb bid [. . .], see id. at 64-65, Daicel Trading Company ("Daicel") bid [. . .], id. at 33, Demo Recycle ("Demo") bid [. . .], see id. at 37, 55, and HVF bid [. . .], see id. at 61-62.

    The SCO reviewed each bid on March 6 or March 7, 2019.  See id. at 60; see also supra note 3.  On March 7, 2019, after reviewing the bids, he informed HVF, Demo, and Daicel that they were not the apparent highest bidder.  Id. at 34, 56, 60.  He then sent those bidders an electronic-mail message ("e-mail") containing the names of the individuals (not the companies) who submitted bids and their respective bid percentage.[4]  Id. at 36, 58, 62.

    In a March 7, 2019 e-mail to Lamb, the SCO informed Lamb that it was the apparent high bidder and described the upcoming review process.  Id. at 64.  The SCO explained that, to start the preaward process, Lamb needed to (1) complete a facility inspection and walkthrough with a DLA representative; (2) fill out and return an End-Use Certificate Form and Statement of Intent; and (3) compile supporting documents for its TSDF plan, safety procedures, processing facility (location, address, and layout, as well as transportation capability to and from Tucson

---

[4]  The SCO explained, in a memorandum for record prepared after contract award, that (1) "[the DLA's] system displays the bidder's first name, last name, time and date of bid and the bid amount in the bid abstract, not the company they work for," and (2) he did not disclose the highest bidder's company name because that information was not shared in the past.  AR 204.

area pick-up locations), financial responsibility, training program, operational standards and procedures, experience, and work schedules.[5]  Id.  The SCO also informed Lamb that he would evaluate the supporting documents, the Trade Security Control Office would review the End-Use Certificate Form, and he would send an official notice of award if Lamb met all of the requirements.  Id.

## 1. Lamb's Submissions

On March 14, 2019, Lamb responded to the SCO's request for information with a variety of documents.  Id. at 66.  Among other items, Lamb included its safety manual, id. at 118-33, completed Statement of Intent, id. at 66-74, lease for an industrial property at 4408 East Illinois Street in Tucson, Arizona from Roger McCrone and Melanie McCrone, id. at 75-117, and a one-page printout from the Arizona Department of Environmental Quality's ("AZDEQ") website, id. at 148.  In its safety manual, Lamb addressed the following topics: expectations, personnel protection, work areas, powered vehicles, hazardous materials/substances and electricity, tools and machinery, fire precautions and emergencies, smoking, and job hazard analysis.  Id. at 118.  Additionally, Lamb noted in its Statement of Intent that (1) Lamb would fulfill its contractual obligations on the property it was leasing from the McCrones; and (2) Roger McCrone was the principal of Scrap Metal Recycling, which previously operated on the site.  Id. at 71.  The AZDEQ printout contained information on why a facility needs a hazardous waste TSDF permit.  Id. at 148.

Although not attached to the aforementioned e-mail, Lamb provided the SCO with financial information and operational details after submitting its bid.  With respect to the financial information, the administrative record includes a letter dated March 7, 2019, from Bank of Southern California—Lamb's bank—that contained the following information regarding Lamb's finances:

| Term Loans | [. . .] |
| Lines of Credit | [. . .] |
| Amount Available to borrower on Lines | [. . .] |
| Current Maturity Date of Line of Credit | [. . .] |
| Deposit Relationship | [. . .] |
| Length of Banking Relationship | [. . .] |
| Status of Banking Relationship | [. . .] |

Id. at 151.  As to the operational details, Lamb submitted information on its experience, equipment, depollution plan, and contingency plan.  Lamb detailed its relevant experience by noting that, "[f]or over 6 years," it "has successfully operated [a] DEMIL program at Red River Army Depot . . . as well as smaller Mobile Projects in Fort Meade[,] Maryland and Limestone[,] Maine."  Id. at 160.  Lamb explained that it has "safely and efficiently depolluted and

---

[5]  The items in this list generally mirror the elements that the DLA identified in the preaward-requirements and criteria-used-for-award sections in the solicitation.  Compare AR 64 (Lamb letter), with id. at 188-89 (solicitation).

DEMILLED over 17,000 vehicles and 72,000,000 [pounds] of metal" in facilities that were "constructed with safety and the environment as their priorities." Id. In an undated letter, Lamb also identified the equipment that it either had on site or expected to arrive prior to starting performance.[6] Id. at 24. Among those items, Lamb listed a stationary shearer and portable shearer. Id. In its depollution plan, Lamb expanded on its commitment to safety by explaining how it "will maintain a safe clean working area at all times." Id. at 159. Additionally, Lamb described a contingency plan; it has "relationships with other processors and recyclers of materials in the Tucson area" that "would permit the use of their facilities to process or De-mil material as a contingency if operations were to cease at [its own facility]." Id. at 25.

## 2. The DLA's Inspections

On March 15, 2019, after receiving materials from Lamb, the SCO asked a group within the DLA to conduct an environmental responsibility determination for Lamb. Id. at 135. Cam Schuemann was tasked with completing the assessment. See id. As part of the assessment, Mr. Schuemann talked with a Lamb representative and, in a summary of the call, noted that Lamb's site "has been a scrap yard for 25 plus years" and that Lamb is "currently in the process of cleaning out [the] previous operations . . . ." Id. at 29. Mr. Schuemann also contacted the fire department for Lamb's facility and spoke to the fire marshal. Id. at 30. The fire marshal represented that Lamb's site had "some code enforcement violations in Feb[ruary]" and "[t]here were some HAZMAT storage issues at the site and other operational issues." Id. When asked whether there was any reason the marshal could think of why the DLA should not sell to Lamb, the marshal responded: "No, this site is zoned for these activities and with the side cleared out, previous issues are no longer a concern . . . ." Id. In addition to his contact with Lamb's representative and the fire department, Mr. Schuemann conducted an internet search and reviewed an EPA Enforcement and Compliance History Online report. Id. at 135. On March 29, 2019, after completing the aforementioned steps, Mr. Schuemann concluded that Lamb was environmentally responsible and submitted that report to the SCO. Id.

On March 25, 2019, Lisa Henninger conducted an onsite survey in which she focused on Lamb's ability to handle hazardous materials and then documented her findings in an April 19, 2019 report. Id. at 26. In that report, Ms. Henninger noted that the AZDEQ conducted a regulatory inspection of Lamb's proposed site on January 1, 2019, and "[t]he results are ongoing." Id. Ms. Henninger also documented that Lamb's "employees are receiving the proper [and] required safety/environmental training," Lamb's "personnel are properly trained to handle spills" of hazardous materials, and "the facility maintain[s] copies of the spill contingency plan[.]" Id. at 27. Ms. Henninger then remarked positively on the physical infrastructure at Lamb's facility as it pertains to safeguarding hazardous materials, see id. (marking "yes" to various questions related to whether "hazardous property storage space [is] provided"), and acknowledged that "[t]he site has several processes in place to maintain environmental responsibility and has Emergency Response Plains/Training," id. at 28. Ms. Henninger

---

[6] Although the letter is not dated, it appears that Lamb wrote the letter between April 5, 2019, and April 14, 2019. See AR 24-25 (identifying the letter as a response to an April 5, 2019 investigation, explaining that a project could "be completed by the end of the week of the 8th," and noting that another project will begin "as soon as the week of April 15th").

subsequently concluded that, for the purposes of the environmental assessment, Lamb was responsible. Id.

On April 5, 2019, Forrist Richardson and Danny Gregory inspected Lamb's facility and then completed the corresponding "Offsite Recycling/Demilitarization Facility Inspection [Report]" on April 7, 2019.[7] Id. at 19, 23. But see id. at 256 (explaining that the inspection team would consist of Messrs. Richardson and Gregory as well as David Powell). In that report, they acknowledged that Lamb had a permit from Tucson for "Salvage/Scrap/Recycling operations," id. at 19; wrote "N/A, new facility" when addressing the "[d]ate and results of [the] most recent compliance inspection," id.; and  remarked that "the facility and area is under extensive renovation and upgrade to allow for Demilitarization/Mutilation of Government property," id. at 20. Messrs. Richardson and Gregory further documented that (1) they did not observe any evidence of environmental contamination, and (2) Lamb keeps a contingency plan at the facility and regularly inspects the facility's operational and safety equipment. Id. at 21-22. The inspectors ultimately recommended Lamb for an award, id. at 19, after concluding that, "[f]rom all indications, discussions, and inspections of facility, the company Lamb has provided confidence to the DEMIL Team that they will be established, prepared and capable of performing the DEMIL contract," id. at 23.

### 3.  Award Decision

On April 8, 2019, the SCO issued a Notice of Award to Lamb.  Id. at 166-67, 172.

### C.  Prior Protests

On April 17, 2019, HVF filed an agency-level protest with the DLA.  See id. at 1.  The SCO denied the protest on May 2, 2019.  Id. at 1, 5.  HVF then filed a protest with Government Accountability Office ("GAO") on May 10, 2019.  Id. at 294.  As relevant here, HVF introduced evidence during that proceeding that, on February 27, 2019, the Pima County Department of Environmental Quality ("PCDEQ") issued to the McCrones a Notice of Violation with respect to Scrap Metal Recycling's activities at 4408 East Illinois Street in Tucson, Arizona.  Id. at 503, 505.  The PCDEQ explained in its notice that the investigator had "reasonable cause to believe [the McCrones] had violated the environmental laws, rules, or regulations of the state of Arizona and/or Pima County" regarding "Unlawful Storage of Solid Waste and/or Unlawful Disposal of Solid Waste."  Id. at 503.  The GAO dismissed the protest on June 26, 2019, because HVF was not an interested party and filed its protest too late.  Id. at 649.

### D.  Procedural History

Following its unsuccessful challenges before the agency and GAO, HVF filed its protest in this court on August 28, 2019.  In its complaint, HVF pleads two claims regarding how the SCO erred when making his award decision.  First, HVF asserts that the SCO failed to follow the terms of the solicitation because he neither considered all of the technical information while

---

[7]  Although Mr. Richardson signed the report on April 8, the report was apparently completed on April 7 because that is when Mr. Gregory signed the report.  AR 23.

evaluating Lamb nor considered that information for the other bidders.  Second, HVF asserts that the SCO acted arbitrarily and capriciously in finding that Lamb met the standards set forth in the preaward survey because he ignored clear evidence that Lamb was incapable of performing the work.  HVF contends that it was prejudiced by those errors because there is a substantial likelihood that it would have been found one of the most advantageous bidders if the SCO complied with its obligations under the solicitation.  Specifically, it alleges that every other bidder would have been deemed not responsible because they could not satisfy the conditions in the preaward survey.  To remedy those asserted prejudicial errors, HVF requests that the court permanently enjoin the DLA from continuing performance of the contract until the SCO obtains information concerning the other bidders and evaluates the bidders according to the terms of the solicitation.

After HVF filed its complaint, Lamb moved to intervene to defend its receipt of the contract, and the court granted that motion.  Shortly thereafter, HVF filed its motion for judgment on the administrative record and attached a declaration from William Elson ("Prejudice Declaration") as an exhibit.  In response, defendant moved (1) to dismiss HVF's complaint for lack of jurisdiction and standing, (2) for judgment on the administrative record, and (3) to strike the Prejudice Declaration.  Lamb filed its own motion in which, for many of the same reasons as defendant, it moves to dismiss HVF's complaint for lack of standing, for judgment on the administrative record, and to strike the Prejudice Declaration.  HVF subsequently submitted a supplemental brief addressing injunctive relief with a declaration concerning that issue from Mr. Elson ("Injunction Declaration").

Briefing concluded on November 19, 2019, and the court heard oral argument on November 21, 2019.  The motions are now ripe for adjudication.

## II.  MOTIONS TO DISMISS

First, defendant and Lamb each move to dismiss HVF's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  A motion filed pursuant to RCFC 12(b)(1) challenges this court's jurisdiction.  Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  When evaluating whether plaintiff has met its burden, the court "must accept all well-pleaded factual allegations as true . . . ."  Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000).  Ultimately, if the court finds that it lacks jurisdiction, then it must dismiss the claim.  Matthews v. United States, 72 Fed. Cl. 274, 278 (2006).

### A.  Subject-Matter Jurisdiction

As relevant here, the court can only exercise jurisdiction over a bid protest that concerns a procurement.  28 U.S.C. § 1491(b)(1) (2018); accord Res. Conservation Grp., LLC v. United

States, 597 F.3d 1238, 1245 (Fed. Cir. 2010) (noting that section "1491(b)(1) in its entirety is exclusively concerned with procurement solicitations and contracts"). A procurement, for the purposes of the court's jurisdiction, is "the process of acquiring property or services." Res. Conservation Grp., 597 F.3d at 1245. The mere disposition of property, however, is not a procurement. Creation Upgrades, Inc. v. United States, 417 F. App'x 957, 959 (Fed. Cir. 2011); see also Res. Conservation Grp., 597 F.3d at 1244-45 (holding that a solicitation of bids to lease government property is not a procurement). But the court may have jurisdiction over a solicitation for a mixed transaction, which occurs when the government is seeking a contractor to buy government property and provide a service. Cf. NASA-Reconsideration, B-408823.2, 2014 CPD ¶ 147 (Comp. Gen. May 8, 2014).[8] Specifically, the court has jurisdiction over such mixed transactions if "the agency receives a concrete tangible benefit that involves the delivery of goods and/or services to the government that are of more than a de minim[i]s value." Id.

HVF argues the court has jurisdiction over the instant protest because the DLA issued the solicitation to secure a contractor for a mixed transaction—the awardee would be providing destruction services and buying the resulting scrap. Defendant counters that the resulting contract is not a mixed transaction because (1) the solicitation is for the mere sale of property, (2) the statutory underpinnings reflect the same, and (3) the GAO held in Resources Recovery International Group, Inc., B-265880, 95-2 CPD ¶ 277 (Comp. Gen. Dec. 19, 1995), that a sale is the principal purpose of a contract to mutilate military equipment and then purchase the resulting scrap.[9]

As indicated above, the mixed-transaction analysis has two parts; the court must determine whether the agency is (1) procuring a service while attempting to sell goods/property and (2) seeking a service that has more than de minimis value to the government. With respect to the first prong, the solicitation contemplates the awardee buying property after first providing a service: the removal and destruction of military weapons and equipment. Indeed, the awardee was required to supply that service before any sale could occur; the DLA only transferred title to the scrap materials after certifying that the awardee adequately destroyed the weapons and equipment. As to the second prong, the significant value the DLA attributed to the demilitarization and mutilation service is reflected in its detailed explanation of the requisite

_____

[8] The court finds the GAO's decision helpful because, as relevant here, the GAO's jurisdiction over bid protests is similar to this court's jurisdiction over such cases. Indeed, as with this court, the GAO has jurisdiction over challenges to a federal agency's attempt to procure property or services. Compare 31 U.S.C. § 3551(1)(A) (2018) (defining "protest" as a challenge to, among other things, "[a] solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services"), and id. § 3552(a) (providing the GAO with jurisdiction over a "protest"), with 28 U.S.C. § 1491(b)(1) (providing jurisdiction over challenges "in connection with a procurement or a proposed procurement"), and Res. Conservation Grp., 597 F.3d at 1245 (defining "procurement" as "the process of acquiring property or services").

[9] Defendant also argues that the GAO's holding with respect to mixed transactions is irrelevant because it was not addressing jurisdiction for purposes of the Tucker Act. The court does not agree. See supra note 8 (explaining that the court's and the GAO's jurisdictional limits in bid protests are similar such that the GAO's decisions are instructive).

procedures and decision to condition any title transfer on the complete destruction of the property.  This is understandable given that the dangerous or secretive nature of military equipment likely precludes the agency from disposing of the property without such processing.  In short, the resulting contract is a textbook case of a mixed transaction.

Defendant's counter arguments are not persuasive.  First, the solicitation at issue here bears no resemblance to solicitation at issue in the Creation Upgrades and Resource Conservation Group decisions relied on by defendant in which the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that the naked sale or lease of land was not a procurement.  See Creation Upgrades, 417 F. App'x at 959; Res. Conservation Grp., 597 F.3d at 1244-45.  Second, defendant's reliance on Hymas v. United States, 810 F.3d 1312 (Fed. Cir. 2016) and Eco Tours Adventure v. United States, 114 Fed. Cl. 6 (2014), is misplaced because both decisions involved a statutory framework in which Congress defined the solicitation process as something other than a procurement.  Hymas, 810 F.3d at 1326-1328 (focusing on the import of the Federal Grant and Cooperative Agreement Act); Eco Tours, 114 Fed. Cl. at 20-21 (addressing the significance of statutes and regulations applicable to the National Park Service).  Although defendant urges the court to draw conclusions based on the DLA paraphrasing language from 40 U.S.C. § 545, which reflects a solicitation process for a sale, the statute and surrounding code sections do not indicate that such a transaction could only be a sale (unlike in the decisions on which defendant relies).  Even if the disposition of property under the noted statute is normally something other than a procurement, there is no indication that such a framework applies when the government—as the DLA did here—requires the provision of a service that is essential to the contract.  The court cannot accept the reasoning that the government could acquire a critical service yet somehow avoid that transaction being characterized as a procurement because the agreement also involves the disposition of property.  Third, the GAO stated in Resources Recovery International Group, Inc. that the principal purpose of a contract akin to the one at issue in this case was a sale but did not address whether the contract was a mixed transaction or express any opinion on the relevant jurisdictional question.[10]  95-2 CPD ¶ 277.  Indeed, the GAO engaged with the protest on the merits, id., which undercuts defendant's reliance on that decision for the proposition that HVF lacks jurisdiction to challenge an award decision based on a similar solicitation.

In sum, the court has subject-matter jurisdiction over HVF's protest because the resulting contract from the solicitation at issue was for a mixed transaction—the awardee would be buying property from the government while also providing a non-de minimis service to the government.

**B.  Standing**

Defendant and Lamb next challenge HVF's standing to bring the instant protest.  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  The court determines standing based on the allegations in the complaint, Acetris Health, LLC v. United

---

[10]  Otherwise stated, the GAO did not hold that a solicitation is not a procurement if the principal purpose of the contract is for the sale of goods or services.  Moreover, GAO decisions, while instructive, are not binding on the United States Court of Federal Claims.

States, 138 Fed. Cl. 579, 594 (2018); accord James v. J2 Cloud Servs., LLC, 887 F.3d 1368, 1372 (Fed. Cir. 2018) ("'[A]t the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element' required for standing . . . ." (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016))), and "must accept the well-pled allegations of agency error to be true," Braseth Trucking, LLC v. United States, 124 Fed. Cl. 498, 506 (2015) (quoting USfalcon v. United States, 92 Fed. Cl. 436, 450 (2010)).

In bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Under section 1491(b)(1), bid protests may only be brought by "interested parties." Interested parties are those "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)). Therefore, to have standing, a protestor must establish that it (1) is an actual or prospective offeror and (2) possesses a direct economic interest in the award of (or failure to award) the contract. CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015); see also Lujan, 504 U.S. at 561 (noting that the burden of establishing standing is on "[t]he party invoking federal jurisdiction"). A protestor has such an economic interest if it could compete for an award but for the procuring agency's error. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001). In addition to being an interested party, section 1491(b)(1)'s standing requirement requires a protestor to "show that it was prejudiced by a significant error in the procurement process." Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009).

Defendant and Lamb both argue, based on United States v. International Business Machines Corp., 892 F.2d 1006 (Fed. Cir. 1989) ("IBM"), that HVF lacks a direct economic interest (and thus cannot have standing) because it is neither next in line for an award nor challenging the intervening bidders. In IBM, the Federal Circuit held that a protestor challenging an award resulting from a sealed-bid solicitation, where the bids differ only as to price, has a direct economic interest only if it is next in line for an award or challenges the intervening bidders' eligibility for an award. Id. at 1010-11. That standard, however, does not apply if there are nonprice considerations. See Gen. Dynamics Mission Sys., Inc. v. United States, 137 Fed. Cl. 493, 512 (2018) (explaining that IBM does not apply when price is only one of the factors being evaluated); see also IBM, 892 F.2d at 1011 (addressing a situation where "the bids differ only as to price").

When determining whether the IBM standard (on which defendant and Lamb rely) is applicable here, the court must focus on how HVF alleges that the SCO was required to evaluate bidders under the solicitation. See Braseth Trucking, 124 Fed. Cl. at 506 (explaining that the protestor's allegations of error are accepted as true for the purposes of standing). In the relevant part of its complaint, HVF alleges that the SCO erred by failing to evaluate each bidder's nonprice factors—the technical information—and then failing to award contracts to the most advantageous bidders based on its review of those factors and the bids. Assuming HVF's assertion of error is correct, as the court must do for the purposes of standing, id., HVF does not need to satisfy the test set forth in IBM to establish standing because nonprice factors were

germane to the award decision, see Gen. Dynamics, 137 Fed. Cl. at 512 (explaining that IBM is limited to sealed bids where price is the dispositive factor).[11]

The question remains, however, whether HVF has demonstrated a direct economic interest in the DLA's award of the contract.  It has.  A protestor has standing if, as noted above, it is an interested party and was prejudiced.  With respect to the first prong of the standing inquiry, HVF has demonstrated that it is an interested party.  Under the framework that HVF asserts the SCO was required to use when making award decisions, HVF alleges that it could compete for an award because its nonprice attributes—it is the incumbent and is located next to Davis-Monthan Air Force Base—are so strong that the SCO could rationally conclude that HVF is one of the most advantageous bidders.  HVF, therefore, is a bidder with the requisite direct economic interest because it has alleged it could compete for an award but for the SCO's purported failure to follow the solicitation's evaluation process.  See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014) (holding that a bidder in a best-value solicitation had a direct economic interest in the procurement decision because it was "the incumbent contractor and was a finalist for the contract award"); see also CGI Fed., 779 F.3d at 1348 (explaining that a protestor is an interested party if it was an offeror who could compete for an award); Braseth Trucking, 124 Fed. Cl. at 506 (noting that standing is based on the protestor's allegations of errors).  In addition, HVF has established the prejudice element of standing by demonstrating a direct economic interest in the procurement.  See CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) ("Although the inquiries are similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest."); see also Impresa, 238 F.3d at 1334 (holding that a protestor has standing if, but for the error, it could compete for an award).

## III.  CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Having concluded that it possesses jurisdiction over this protest and that HVF has standing, the court turns to the parties' cross-motions for judgment on the administrative record. In ruling on such motions pursuant to RCFC 52.1(c), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, 404 F.3d at 1356.

The court reviews challenged agency actions pursuant to the standards set forth in the Administrative Procedure Act.  28 U.S.C. § 1491(b)(4).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[11]  If IBM were applicable, which it is not, HVF has met its burden of establishing standing because it alleges that it submitted a bid and challenges the higher bidders' eligibility for an award.  See Compl. ¶¶ 87-89 (alleging that the other bidders were not responsible because they could not satisfy the preaward survey); see also IBM, 892 F.2d at 1010-11 (explaining that a bidder has standing if challenges the intervening bidders' eligibility for an award).

accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa, 238 F.3d at 1332-33); accord Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency."), reversed on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

After showing "a significant error in the procurement process," a protestor typically must show "that the error prejudiced it" to prevail.  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  "[I]n a bid protest under the [Administrative Procedure Act, however,] prejudice is presumed when the Government acts irrationally."  Caddell Constr. Co. v. United States, 125 Fed. Cl. 30, 50-51 (2016); accord Textron, Inc. v. United States, 74 Fed. Cl. 277, 329 (2006) (explaining that there is "no need to continue to prejudice" when "the Government has acted arbitrarily and capriciously" because that "necessarily invalidates the procurement"); see also Impresa, 238 F.3d at 1333 (distinguishing between protests in which the offeror must show that the award decision was irrational and protests in which the offeror most show a prejudicial violation of a statute or regulation).  If the protestor establishes a different type of error, then it must establish prejudice by showing that it possessed a substantial chance of receiving an award absent the alleged error.  Banknote, 365 F.3d at 1350; see also Caddell, 125 Fed. Cl. at 50 ("[W]hen an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice").

Cognizant of the above standard, HVF argues that the SCO acted irrationally because of how he evaluated (1) bidders other than Lamb and (2) Lamb's submissions.

**A.  Evaluation of Bidders Other Than Lamb**

HVF first argues that the SCO erred by failing to consider nonprice factors identified in the criteria-used-for-award section for bidders other than Lamb.  Specifically, HVF contends that the SCO needed to conduct a holistic review of every bidder because that process is the only way to identify the most advantageous bid—the standard set forth in the solicitation.  Defendant and Lamb counter that, under the solicitation, the SCO was to select an awardee by identifying the highest bidder and then determining if that bidder was qualified.[12]  Fleshing out that argument, Lamb asserts that the elements in the criteria-used-for-award section are only relevant to the responsibility determination, which is normally assessed after the apparent highest bid is identified.  Thus, fundamentally, the parties disagree on how the solicitation should be interpreted.

The court interprets a solicitation in the same manner as it would a contract.  See Banknote, 365 F.3d at 1353 n.4.  Thus, as with the interpretation of a contract, the "[i]nterpretation of the solicitation is a question of law . . . ."  Id. at 1353.  The court begins by examining the solicitation's plain language, and in doing so considers "the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  Id.; see NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning . . . ."  Banknote, 365 F.3d at 1353.

If the solicitation is ambiguous, the court continues its inquiry.  See id.  The solicitation is ambiguous if it "is susceptible to more than one reasonable interpretation."  Id.  If the solicitation contains an ambiguity, then the court must determine whether that ambiguity is patent.  Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996).  "A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable

---

[12]  Defendant also argues that the SCO was required to select the highest bidder because the DLA was attempting to sell surplus property (rather than procure services), and the SCO must select the highest bid under the regulations applicable to such sales.  As noted above, however, the court does not agree with the conclusion that the DLA was merely soliciting buyers for government property.  Supra Section II.A.  The destruction of military weapons and equipment was clearly fundamental to the solicitation.  Hypothetically, the court might agree with defendant if this case concerned the sale of surplus government desks.  But the very nature of tangible property at issue—military equipment, munitions, and the like—tilts the scales towards a different result because the United States government would not want such property to fall into the hands of those with ill-intent.  Thus, there is no evident reason for the SCO to be bound by the regulations that apply to the disposition of property.  Moreover, even if the noted regulations were applicable, the SCO was not prohibited from selecting an awardee who is not the highest bidder.  See 41 C.F.R. § 102-38.275 (2019) (permitting the contracting officer to reject the highest bid if doing so is advantageous to the government); see also 40 U.S.C. § 545(a)(1)(A) (2018) (requiring that an award be made "to the responsible bidder whose bid . . . is most advantageous to the Federal Government, price and other factors considered").

contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000).  Patent ambiguities are "'obvious, gross, [or] glaring.'" Grumman Data Sys., 88 F.3d at 997 (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974)).  If a solicitation contains a patent ambiguity, the protester's interpretation of the solicitation will fail unless it previously sought clarification from the procuring agency regarding the ambiguous language. Id. at 997-98; accord Stratos Mobile Networks USA, 213 F.3d at 1381.  If the ambiguity is not patent, and the protester demonstrates that it relied upon the ambiguity, then the court applies the general rule that the ambiguity will be construed against the drafter of the solicitation—the procuring agency.  See NVT Techs., 370 F.3d at 1162.

### 1.  Reasonableness of Interpretations

It is understandable why HVF has one interpretation of the solicitation, while Lamb, the SCO, and defendant read the solicitation in a different way.  The solicitation, as explained in greater detail below, has inconsistencies, confusing headings, and no explicit statement concerning the process that the SCO would use for determining an awardee.  Because of these issues, the solicitation is, in effect, a Rorschach test:  people find different meaning in the same clauses.  It is unsurprising, therefore, that the court finds merit in each party's reading of the solicitation based on the plain language.

With respect to HVF's interpretation that the SCO must evaluate each bidders' technical information, that understanding of the solicitation is reasonable for a couple of reasons.  First, the DLA acknowledged in the solicitation that there could be more than one awardee through its reference to "award(s)," but such a result would be implausible if the SCO was limited to reviewing nonprice information for the highest bidder.[13]  It is also reasonable to read the possibility of multiple awards as reflecting that the SCO would compare bidders' nonprice information because the DLA acknowledged that there was no special right associated with being the highest bidder.  Second, the DLA indicated that the SCO would conduct a holistic review of each bidder by stating that awardees would be chosen based (in part) on "whose bid was the most advantageous."  Although the most advantageous "bid" could mean the highest price because the "bid" was seemingly limited (in relevant part) to price, it is reasonable to not construe it as so limited because doing so would render the phrase redundant in light of the preceding portion of the sentence in which the DLA noted that the award would be based in part on the highest-priced bid.[14]  Indeed, the notion that the focus on the most advantageous bid refers

---

[13]  Theoretically, the SCO could make multiple awards after reviewing only the highest bid if there were multiple bidders who provided the same price.  But that situation is unlikely given the range of bids that were submitted, and the fact that bidders provided their price as a percentage with five digits.

[14]  In the solicitation, the DLA indicated that a bid was limited to price and contact information.  But the DLA also stated that, during the preaward phase, a purchaser would need to complete a Statement of Intent.  That form contains a section in which the signatory acknowledges that the information it is providing on the form, which is more than price and

to more than price is buttressed by the next sentence in which the DLA explained that a bidder does not receive any special right by being the highest bidder.

Defendant and Lamb also reasonably interpret the solicitation as only requiring the SCO to review technical information for the highest bidder (rather than all bidders).  There is support for their reading in the text and structure of the solicitation.  First, the DLA made the technical information part of the responsibility determination, and there is no apparent need to compare each bidders' responsibility because responsibility is not a matter of degrees—a bidder either is or is not responsible.  It is reasonable, therefore, to conclude that the technical information is only relevant after the SCO identifies the presumptive awardee based on other considerations.  Second, the DLA did not state in the solicitation that all bidders would be required to submit technical information, explain how bidders would submit that information, or inform bidders of when to do so.  It would be peculiar if the DLA requested incomplete submissions from the bidders such that the SCO needed to request more information from every bidder before starting the evaluation process.  Third, the DLA noted that the award would go to the bidder "whose bid is most advantageous."  The focus on "bid"—rather than "bidder"—indicates that the comparison is limited to price, as is traditionally the case in sealed-bid solicitations.

In light of the above, the solicitation is ambiguous because it can reasonably be interpreted in at least two ways.

## 2.  Patent or Latent Ambiguity

Because the solicitation is ambiguous, the next question is whether the ambiguity was patent or latent.  A patent ambiguity exists, as noted above, when there are glaring or obvious inconsistencies.  The problems with the solicitation underlying this protest are apparent on the face of the solicitation.  The relevant headings are borderline nonsensical when read together.  Indeed, the court struggles to discern any guidance from the headings "Bidding and Award Criteria," "Bidder, "Pre-Award Requirements," and "Criteria used for Award."  Among other issues with the headings, the "Criteria used for Award" heading appears superfluous given that a preceding heading is "Bidding and Award Criteria."

The problems with this solicitation extend beyond the headings.  Under each heading, there are issues with the content that should have prompted a prospective bidder to seek clarification from the DLA.  First, there is a meaningful disconnect between the headings and the underlying content.  For example, the apparent standard for evaluating bids is the only content under the "Bidder" heading, and the content under the "Pre-Award Requirements" heading includes information on a postaward conference; a postaward inspection; and postaward compliance with laws, regulations, and procedures.  Additionally, the DLA provided a standard for award but did not outline a process for the SCO to follow when evaluating bidders.  Moreover, the DLA confusingly stated that (1) the technical information would be germane but failed to address when (or how) that information should be submitted, and (2) an awardee needed to have the most advantageous bid (suggesting a single award) after earlier in the sentence

---

contact information, is "considered a part of the bid . . . ."  AR 72.  In short, it is unclear precisely what "bid" means for the purposes of this solicitation.

acknowledging that there could be multiple awards and identifying highest-price as a separate factor. Finally, the DLA introduced additional confusion by interchangeably using the terms "bidder," "purchaser," and "potential purchaser" in the relevant sections of the solicitation.

In short, there are significant inconsistencies and issues that should have prompted HVF to seek clarification before submitting a bid. Because HVF did not seek such clarification, HVF cannot successfully challenge the SCO's interpretation of the solicitation. Grumman Data Sys., 88 F.3d at 997-98; see also Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). Thus, HVF has not demonstrated the SCO failed to follow the solicitation when he only considered the technical information for Lamb.

### B. Evaluation of Lamb

HVF also argues that the SCO did not evaluate Lamb's technical information in the manner specified in the solicitation. Specifically, HVF contends that the SCO failed to consider that Lamb did not provide the required information for the following criteria: safety procedures, training, preaward survey, financial responsibility, and TSDF plan.

### 1. Safety Procedures

First, HVF argues that the SCO failed to follow the terms of the solicitation because he did not consider all of the requisite elements for the safety criterion. Specifically, HVF asserts that Lamb submitted its Safety Policy and Procedure Manual, "but that manual did nothing to address safety procedures covering 'all phases of the contract work including, but not limited to: mutilation, demilitarization, dismantling, asbestos removal, scrapping, handling, loading, transporting, securing loads and first aid procedures.'" Pl.'s Mot. J. Administrative R. 17 (quoting AR 188). This argument is not persuasive because HVF fails to identify precisely what information is not included in the manual and instead leaves it to the court to cross-check the manual with the contents of the safety criterion. See Centech Grp, 554 F.3d at 1037 (noting that the protestor has the burden of showing error); see also Barros v. Beck, 28 F. Supp. 3d 31, 39 (D.D.C. 2014) ("[The party's argument is] so conclusory that the Court cannot assess the merits of it and, moreover, the Court is not inclined to do the parties' work for them."). Moreover, HVF fails on the merits. It seemingly argues that the specified information needed to be in the safety manual, but the solicitation does not contain such a requirement. See AR 188 (noting, merely, that "safety procedures should be addressed"). HVF fares no better to the extent that it is arguing that the record does not contain evidence on the requisite safety issues. The record contains reports in which Lamb's safety measures were reviewed and documentation of Lamb's safety practices at other sites, and the SCO could rationally find that evidence sufficient for the safety-procedures criterion.

## 2. Training

Second, HVF argues that the SCO failed to consider the necessary information related to training because there is no record evidence concerning Lamb's compliance with RCRA, TSCA, DOT, and OHSA training requirements. Those requirements all concern, as relevant here, employees' work with toxic or hazardous materials. See Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629 (2018) (providing the EPA with authority to require reporting, record-keeping and testing requirements, and restrictions relating to chemical substances and mixtures); Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6991I (2018) (creating a framework for the proper management of hazardous and nonhazardous solid waste); AR 188 (indicating that the required training concerns hazardous materials). Although Lamb did not submit materials in which it explicitly addressed the laws and standards identified in the solicitation, there is record evidence on Lamb's training measures that are germane to the SCO's evaluation. Lamb submitted documentation explaining how it handled hazardous materials at other sites. Additionally, there are reports in the record reflecting that Lamb's employees were properly trained to handle spills of hazardous materials, Lamb's facility had safety measures in place, and Lamb was capable of performing the contract (which includes a requirement to comply with all applicable laws concerning the environment and human safety). Most importantly, however, Ms. Henninger noted in her report that Lamb's employees received the required environmental and safety training. After reviewing the aforementioned record evidence, the SCO could rationally conclude that Lamb had an adequate training program for compliance with the relevant RCRA, TSCA, DOT, and OHSA requirements. See Tinton Falls, 800 F.3d at 1358.

## 3. Preaward Survey

Third, HVF argues that the SCO erroneously concluded, as part of the preaward survey, that Lamb was capable of complying with the applicable laws because its proposed site was the subject of a PCDEQ Notice of Violation. As an initial matter, the record does not reflect that the SCO was aware of the violation when making the award determination because the notice became part of the record during HVF's GAO protest. Assuming that the SCO was (or should have been) aware of the notice, HVF fails to explain how the notice is relevant to assessing whether Lamb is capable of legal compliance given that it was not the recipient of the notice. Even if the notice was relevant to assessing Lamb's compliance ability, the administrative record reflects that, after the notice was issued, Lamb was renovating the property to comply with the contract requirements. Moreover, notwithstanding the remedial measures, the administrative record contains reports reflecting that Lamb had processes in place for its environmental responsibilities and could perform the contract at the site (which, as noted above, required compliance with the applicable laws).[15] The SCO, in light of the above, rationally concluded that Lamb was capable of complying with the applicable laws.

---

[15] HVF asserts that Messrs. Richardson and Gregory erroneously concluded in their report that there was no recent compliance inspection to consider even though the PCDEQ had recently issued a Notice of Violation for Lamb's site. Assuming that Messrs. Richardson and Gregory were even aware of the notice, their conclusion that there was no applicable recent inspection was based on the fact that they were evaluating a new facility—indeed, they noted as

HVF also argues that the SCO failed to consider that Lamb did not have a shredder when assessing Lamb's technical qualifications as part of the preaward survey. Specifically, HVF asserts that a technically qualified bidder was required to have a shredder because the awardee needed to shred data plates and military markings on property provided under the contract. The court is not persuaded because HVF fails to either identify a list of required equipment in the solicitation or explain why Lamb could not shred property using its shearers.[16] Centech Grp, 554 F.3d at 1037 (noting that the protestor has the burden of showing error). Compare The American Heritage College Dictionary 1277 (4th ed. 2004) (defining "shear" as "[a]ny of various implements or machines that cut with a scissorlike action"), with id. at 1285 (defining "shred" as "[t]o cut or tear into shreds"). Moreover, the SCO rationally concluded that Lamb could perform the required tasks with its equipment given that Messrs. Richardson and Gregory recommended Lamb for an award after inspecting the facility and learning of Lamb's onsite equipment.

Next, HVF argues that the SCO erred when it found that Lamb had the requisite technical qualifications to perform the work even though Lamb suggested that it may not be able to do so at its proposed site. Specifically, HVF avers that Lamb made that suggestion by providing a contingency plan in which it stated that it could perform the contract at another site if operations were to cease at its own facility. The mere existence of a contingency plan, however, does not indicate that Lamb would be (or might be) unable to perform at its site. Indeed, given the lack of other record evidence reflecting Lamb would not be able to perform at its chosen site, the SCO could reasonably conclude that Lamb was merely following good business practices by having a plan to guard against potential (even if unlikely) events that could hinder its performance.[17] In sum, HVF fails to demonstrate that the SCO acted irrationally when it found that Lamb satisfied the technical-qualifications component of the preaward survey.

### 4. Financial Responsibility

Further, HVF argues that the SCO failed to consider the necessary materials related to financial responsibility because Lamb did not provide its cost projections despite being required to do so pursuant to the terms of the solicitation. Under the solicitation, a bidder was required to submit its cost projections to be eligible for an award. See AR 188 (requiring that, for the

---

much in the report—and that facility had not been inspected. That is a rational conclusion because there is no apparent reason why another company's compliance issues at Lamb's proposed site would be attributable to Lamb, especially given that Lamb stated it was extensively renovating the site. Moreover, regardless of the propriety of Messrs. Richardson's and Gregory's conclusion, the SCO could still rely on Ms. Henninger's conclusion in her environmental report that Lamb was responsible—a determination that is directly relevant to whether Lamb could comply with the applicable laws.

[16] HVF misconstrues the applicable burden when it argues in its reply brief that defendant does not identify any way to shred material other than using a shredder.

[17] The notion that a contingency plan constitutes a good business practice is buttressed by the fact that Ms. Henninger, Mr. Richardson, and Mr. Gregory all favorably reviewed Lamb after noting that it had a contingency plan for different aspects of its operations.

financial responsibility criterion, the bidder "[p]rovide a cost projection with regard to each contract operation"); see also id. at 187 (noting that the award would be made to a bidder who, among other things, was responsible), 189 (requiring the bidder to submit the information that the DLA requested in the solicitation and explaining that unsatisfactory responses will preclude the bidder from being found responsible).  Because Lamb did not submit its cost projections, the SCO failed to follow the terms of the solicitation when he awarded a contract to Lamb.

Defendant's and Lamb's counterarguments are not persuasive.  First, defendant and Lamb miss the point when they argue that the SCO rationally concluded that Lamb was financially responsible based on the bank statement it submitted.  Even if the SCO rationally concluded that Lamb was financially responsible, his conclusion was not germane to whether Lamb submitted the required documentation.  Otherwise stated, defendant and Lamb focus on the second step of the inquiry (assessing financial responsibility) and do not account for the error in the first step (determining whether the bidder submitted the required materials).  The SCO needed to complete both steps before awarding a contract, and he failed to do so.  Second, Lamb unpersuasively argues that HVF waived any challenge to the SCO's financial-responsibility determination by not raising the issue during its agency or GAO protest.  "There is no requirement that a protestor raise each and every protest ground before the GAO before those protest grounds may be raised in a protest before this court."  Sotera Def. Sols., Inc. v. United States, 118 Fed. Cl. 237, 255 n.8 (2014).  Indeed, "[n]ew protest grounds in cases before this court are not waived merely because the GAO had no chance to consider them in a previous protest."  Id.

A procuring agency is "bound by the language of the Solicitation," and therefore must follow the stated evaluation procedures.  GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 491 (2012); see also Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999) (noting that the procuring agency is bound by the terms of a solicitation and violates the law by waiving a portion of the evaluation standard without issuing an amendment); Beta Analytics Intern., Inc. v United States, 44 Fed. Cl. 131, 138 (1999) ("[I]f a protestor can demonstrate an instance in which a procuring official failed to abide by the a mandatory solicitation provisions, the protestor will prevail, provided that it can demonstrate [prejudice].").  Because the SCO did not require Lamb to provide cost projections required by the solicitation to establish financial responsibility, HVF has demonstrated that the SCO acted irrationally.

### 5. TSDF Plan

HVF argues that the SCO did not evaluate the TSDF-plan criterion in the manner specified in the solicitation because he did not account for the lack of record evidence concerning the required components of that plan.  To receive an award, a bidder needed to submit a TSDF plan detailing, among other things, its temporary storage facility meeting the requirements of 40 C.F.R. § 761.65, its procedures for dealing with polychlorinated biphenyls, and the EPA identification number for its facility.  Lamb did not submit such a plan.  Because Lamb failed to submit the materials necessary to receive a contract, the SCO failed to follow the terms of the solicitation when he awarded Lamb a contract.

Defendant's and Lamb's counterarguments fall short.  They both argue, essentially, that Lamb provided sufficient information for the TSDF-plan criterion by submitting a one-page printout of an AZDEQ website reflecting that a permit is not required if waste is stored for a short period of time.  The printout, however, contains none of the information that the DLA requested in the relevant part of the solicitation.  Lamb further argues that the SCO found that, by submitting the printout, Lamb adequately explained that the requested information was irrelevant to its work because the plan only applies to companies that store materials for longer than Lamb intended to for the contract.[18]  But the DLA did not state in the solicitation that providing the TSDF-plan information was optional or condition the submission of that information on whether the bidder expected to store hazardous materials for a specific period of time.  Even if the submission of the information was so conditioned, Lamb never represented to the SCO that the information was irrelevant or that the materials would not be stored for the specified time.  Lamb merely submitted a page from the AZDEQ website without providing any context for why the document, which contains no Lamb-specific details, was relevant.[19]  Finally, Lamb argues that HVF waived its challenge to the SCO's evaluation of the TSDF plan by not raising the argument during its prior protests.  As explained above, Lamb's waiver argument is not well founded.

In sum, HVF has established that the SCO acted irrationally by not following the evaluation process set forth in the solicitation when he considered whether Lamb provided the necessary information for the TSDP-plan criterion.

## C. Prejudice

Because the SCO erred when making his award decision, the court proceeds to consider whether HVF was prejudiced by those errors.  The court presumes that HVF was prejudiced because, as explained above, the SCO irrationally evaluated Lamb's submission by failing to comply with the terms of the solicitation.  Accord Caddell, 125 Fed. Cl. at 50-51; see also GTA Containers, 103 Fed. Cl. at 491 ("[T]he resulting harm to an offeror whose proposal was not fairly considered due to the departure from the Solicitation's framework constitutes sufficient prejudice for this court to find that plaintiff has succeeded on its merits challenge to the [procuring agency's] evaluation of the proposals.").  Defendant and Lamb fail to address that presumption; defendant does not address prejudice at all, while Lamb focuses its prejudice contentions on the relevance of HVF's experience and the Prejudice Declaration.  Thus, the aforementioned presumption is controlling in this case.

---

[18]  In its argument, Lamb alternates between talking about the TSDF plan and a TSDF permit.  To the extent that Lamb focuses on the permit, its argument is unpersuasive because the DLA neither requested information regarding a permit nor required bidders to have that permit.

[19]  The notion, which Lamb champions, that the SCO construed the printout as Lamb's explanation for why it did not need a TSDF plan is undermined by the fact that the SCO was apparently confused regarding the purpose of the document.  Indeed, the SCO asked Lamb (who apparently never responded) whether, by virtue of submitting the document, it was "stating that [its] process facility is exempt from having [a TSDF] permit[.]"  AR 253.

Even if the court did not presume prejudice, HVF has established that it was prejudiced. A protestor establishes prejudice by, as noted above, demonstrating that it had a substantial chance of receiving an award if the SCO had not erred. Banknote, 365 F.3d at 1350. To make such a showing here, HVF must establish that the SCO could have rationally rejected the higher bidders and selected HVF.[20] See IBM, 892 F.2d at 1110-11. The court agrees with HVF that it has met that burden. Lamb was ineligible for an award under the terms of the solicitation (for the reasons stated above), and the SCO could rationally conclude that Daicel and Demo—the two other bidders—were also ineligible for an award because they lacked experience. With respect to the latter two bidders, HVF argues that the SCO could conclude that they lack the necessary experience for an award because it appears that Daicel has not performed demilitarization work and Demo has not performed on a project as large as the one contemplated under the disputed contract. Defendant and Lamb lodge no substantive disagreement with HVF's factual contentions.[21] HVF, in contrast, has provided evidence that it meets all of the necessary qualifications. Indeed, Mr. Elson—HVF's Senior Vice President and General Counsel—explained in the Prejudice Declaration that, when bids were submitted, HVF was the incumbent contractor, had decades of relevant experience, and possessed the requisite tools and financial resources.[22] Prejudice Decl. ¶¶ 1, 4, 12. His statement, coupled with the other bidders'

---

[20] The court did not apply this standard when evaluating prejudice for the purpose of standing because HVF alleged errors that rendered IBM inapplicable. See supra Section II.B. Now, however, the court evaluates prejudice based on the errors that HVF established rather than merely alleged. L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."). Thus, the Federal Circuit's test in IBM is applicable because HVF has not established that the SCO erred by focusing on price when identifying the prospective awardee. See IBM, 892 F.2d at 1110-11 (explaining that a plaintiff protesting the award of a contract under an invitation for bids in which price is the critical consideration establishes prejudice by being the second-highest bidder or challenging the eligibility of the intervening bidders); see also supra Section III.A (rejecting HVF's argument that the SCO needed to review nonprice considerations for every bidder).

[21] In response to HVF's contentions regarding the other bidders, defendant and Lamb make a procedural argument. Specifically, they dispute the propriety of considering Daicel's and Demo's experience (or lack thereof) because that information is not in the administrative record. It is true that HVF relies on evidence that is not in the administrative record to argue that it was prejudiced and instead challenges the other bidders' eligibility for an award based on information found on the Internet. HVF was entitled to do so because the administrative record could not have contained such information as the SCO did not evaluate nonprice factors for Demo or Daicel. See N.C. Bus. Enters. Program v. United States, 110 Fed. Cl. 354, 365 (2013) (acknowledging that a protestor can rely on evidence that is not in the administrative record to establish prejudice because the relevant facts may not be reflected in the underlying record).

[22] Defendant and Lamb have moved to strike the Prejudice Declaration, but the court concludes that it is appropriate to consider that declaration when evaluating prejudice. See infra Part V.

potential issues, is enough for HVF to establish that it had a substantial chance at an award but for the SCO's errors.

Based on the above, HVF has established that it was prejudiced by the SCO's errors.

## IV.  HVF's Requested Relief

To remedy the DLA's prejudicial errors, HVF requests injunctive relief.  The precise contours of the relief HVF seeks, however, is only relevant if it is entitled to an injunction. When determining whether to award a permanent injunction, the court must consider whether (1) HVF has succeeded on the merits, (2) HVF will suffer irreparable injury if the court withholds injunctive relief, (3) the balance of hardships favors the grant of injunctive relief, and (4) injunctive relief is in the public interest.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  HVF bears the burden of establishing the factors by a preponderance of the evidence.  Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014).  None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).[23]  If the court awards injunctive relief, it may fashion its own remedy to fit the contours of its decision.  See Turner Const. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) ("[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy.").

Because plaintiff has established the existence of prejudicial procurement errors, it has succeeded on the merits of its protest.  Thus, the court addresses the remaining equitable factors.

### A.  Irreparable Injury

Relying on its Injunction Declaration, HVF argues that it would suffer an irreparable injury without an injunction because it will lose significant pretax earnings and may need to reduce its workforce to compensate for the lost profits.  Defendant counters that HVF has only suffered economic losses, which are insufficient for an irreparable injury.  HVF has the better argument.  This court has recognized that a lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute irreparable injury.  See, e.g., Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 78 (2007).  Relatedly, a protestor can establish an irreparable injury if "the loss of the business from th[e] solicitation [at issue] will result in layoffs and potentially a threat to the viability of the business." 360Training.com, Inc. v. United States, 106 Fed. Cl. 177, 197 (2012).  HVF has made the requisite showing of irreparable injury because, by virtue of the SCO's failure to follow the terms of the solicitation, HVF was denied the opportunity to compete for a contract and reap the expected profits.  See Injunction Decl. ¶¶ 8-9 (averring that HVF will lose [. . .] in pretax earnings without the contract); supra Part III (holding that the SCO could have awarded a

---

[23]  Although FMC Corp. concerns the award of a preliminary injunction, 3 F.3d at 427, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

contract to HVF if he followed the terms of the solicitation). Moreover, HVF has established that its viability is endangered without an injunction because (1) the contract would have accounted for approximately [. . .] of its business, and (2) HVF will [. . .] if it does not receive the contract. Injunction Decl. ¶¶ 6, 11.

## B.  Balance of Hardships

Next, HVF argues that the balance-of-hardships factor is in its favor because the DLA would only need to temporarily delay performance while reassessing who should receive an award, and the DLA has repeatedly shown a willingness to pause Lamb's work under the contract. Defendant counters that the DLA is harmed by not being able to use its chosen contractor who supplied the highest bid and met the necessary conditions. HVF makes a compelling case. HVF will incur substantial financial losses without an injunction, which is a significant hardship. Injunction Decl. ¶¶ 8-9. Although the DLA may be burdened by having to pause contract performance, "only in an exceptional case would [such a delay] alone warrant a denial of injunctive relief . . . ." Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 399 (1999), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001). There are no extraordinary circumstances here; indeed, the DLA has previously paused Lamb's performance, AR 196 (stopping performance during the agency-level protest), and threatened to cancel the contract after Lamb started performing, id. at 194 (stating the contract may be terminated if Lamb failed to obtain a certification). Moreover, defendant's argument is not persuasive because it is relying on a faulty premise: the notion that it awarded a contract to a qualified bidder. See Sections III.B.4-5, supra. Thus, the balance of harms tilts in HVF's favor.

## C.  Public Interest

The final consideration is whether it is in the public interest to grant injunctive relief. HVF argues that this factor also is in its favor because there is a strong public interest in ensuring that the SCO follows the terms of the solicitation and safeguards the public fisc by choosing the most advantageous bidder. Defendant counters that the public has an interest in allowing agencies to use government solicitation vehicles and enjoining the contract based on HVF's misunderstanding of the law would hamper the proper functioning of the sale process. HVF has the better argument here too. "[T]he public interest is served by enforcing a procurement process that conforms with regulatory authority and the solicitation's evaluation criteria." Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 521 (2003); accord Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 772 (2008) (holding that the public interest was compromised when the contracting officer awarded contracts based on improper evaluations). Although the grant of injunctive relief will delay the DLA's procurement of demilitarization services and disposition of surplus property, the public has a greater interest in ensuring that the SCO complies with the terms of the solicitation. Moreover, defendant's rebuttal—which concerns how the public is harmed by granting relief based on a protestor's incorrect understanding of the law—is based on a flawed premise: the court considers the public interest only after concluding that the DLA misapplied the law when it issued an award to Lamb. In sum, HVF has established that it is in the public interest to award injunctive relief.

### D. Appropriate Relief

After reviewing the record, the parties' briefing, and their representations, the court concludes that HVF has established by a preponderance of the evidence that each of the factors noted above weigh in favor of an injunction.  The question now is the appropriate scope of such relief.  HVF requests that the court permanently enjoin the DLA from continuing performance of the contract unless and until it "(1) obtains information for the 'other factors' as of the pre-award time period and conducts a proper evaluation of the offerors' bids in accordance with the terms of the Solicitation; or (2) in the alternative, cancels the Solicitation and conducts a new procurement consistent with the terms of the new solicitation."  Pl.'s Mot. J. Administrative R. 23. But awarding that relief is not appropriate because the court neither concluded that the SCO erred with respect to the evaluation of the non-Lamb bidders nor identified an error that would require a new solicitation.  In light of the analysis in Part III, supra, the court concludes that the appropriate remedy is for the SCO to either (1) cancel its contract with Lamb and determine a new awardee under the existing solicitation, or (2) cancel its contract with Lamb and rebid the procurement under a new solicitation.  The DLA must choose one of those options to cure the errors noted above.

### V.  MOTIONS TO STRIKE

Defendant and Lamb both move to strike the Prejudice Declaration, which HVF included as an exhibit to its motion for judgment on the administrative record in this case, on the grounds that the court's review is limited to the administrative record.  The court's merits review is generally limited to the administrative record, Pinnacle Sols., Inc. v. United States, 137 Fed. Cl. 118, 131-32 (2018), but the court may consider a declaration not contained in that record when adjudicating whether the protestor was prejudiced, CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 484 n. 5 (2013); see N.C. Bus. Enters. Program, 110 Fed. Cl. at 365 ("[I]t is proper to admit an affidavit to show prejudice—even though it is not proper to show error.").  Here, HVF only refers to the Prejudice Declaration in support of its argument concerning prejudice, Pl. Mot. J. Administrative R. 20-21, and the court only considered the contents of the declaration for that purpose, see supra Section III.C.  Thus, the court denies defendant's and Lamb's motion to strike the Prejudice Declaration.

### VI.  CONCLUSION

For the reasons discussed above, the court **GRANTS** HVF's motion for judgment on the administrative record and **DENIES** defendant's and Lamb's motions to dismiss, cross-motions for judgment on the administrative record, and motions to strike the Prejudice Declaration.  HVF is entitled to injunctive relief.  Specifically, the court **ENJOINS** the DLA from continuing performance on the contract awarded to Lamb pursuant to the solicitation at issue in this protest, **DIRECTS** the SCO to cancel the contract awarded to Lamb, and further **DIRECTS** the SCO to either (1) select a new awardee from among the existing bidders in accordance with the terms of solicitation A0007598 or (2) issue a new solicitation.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine

proposed redactions to which all the parties agree.  Then, by **no later than Wednesday, December 4, 2019,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.  The parties also shall, **by the same date,** file any redacted versions of documents they filed under seal in this case to the extent such redacted versions have not already been filed.

      **IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge
